**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

JUDGE KAPLAN

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>    Plaintiff,<br><br>v.<br><br>PTG CAPITAL PARTNERS LTD, PST CAPITAL GROUP LTD, NEDKO NEDEV, STRATEGIC CAPITAL PARTNERS MUSTER LIMITED, and STRATEGIC WEALTH INVESTMENTS, INC.,<br><br>    Defendants. | 15-CV-___ (__)   **15 CV 04290**<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>RECEIVED<br>JUN 04 2015<br>U.S.D.C. S.D.N.Y.<br>CASHIERS |

Plaintiff Securities and Exchange Commission (the "Commission") files this Complaint against defendants PTG Capital Partners LTD ("PTG Capital"), PST Capital Group LTD ("PST Capital"), Nedko Nedev ("Nedev"), Strategic Capital Partners Muster Ltd. ("Strategic Capital"), and Strategic Wealth Investment, Inc. ("Strategic Wealth") and alleges as follows:

## SUMMARY

1.      This matter involves defendants' coordinated attempts to fraudulently manipulate the price of the securities of three issuers, Avon Products, Inc. ("Avon"), Tower Group International, Ltd. ("Tower Group"), and Rocky Mountain Chocolate Factory, Inc. ("Rocky Mountain") through filing false tender offers on the Securities and Exchange Commission's public database (commonly known as EDGAR) and issuing a fraudulent press release.

2.      On May 14, 2015, an entity named PTG Capital Partners LTD that had gained access to EDGAR, filed a tender offer for Avon falsely stating that it had proposed to acquire all of Avon's stock at a premium of approximately 181% above the stock's closing price on

May 13. As a direct result of this fraud, Avon's share price increased approximately 20% in intra-day trading and the volume increased approximately 448% in one day.

3.     On May 13, 2014, a fraudulent press release was issued in the name of Euroins Insurance Group ("Euroins Insurance") stating that the company had submitted an offer to Tower Group to acquire the company's outstanding common stock for $3.75 per share. As a direct result of this press release, Tower Group's share price increased 32% and the volume increased 1,963% in one day.

4.     On December 18, 2012, an entity named PST Capital Group LTD that had gained access to EDGAR, filed a tender offer for Rocky Mountain falsely stating that it had proposed to acquire all of Rocky Mountain's stock at a premium of approximately 27% above the stock's closing price earlier that day. As a direct result of this fraud, Rocky Mountain's share price increased 4.6% and the volume increased approximately 1,780% in one day.

5.     Nedko Nedev, who used a brokerage account held in the name of Strategic Capital Partners Muster Limited to trade equities and derivatives, held positions in Avon, Tower Group, and Rocky Mountain prior to these stock manipulations. Nedev and others executed this scheme to manipulate the prices of these securities so that he could sell his positions at artificially-inflated prices. In addition, a brokerage account in the name of Strategic Wealth Investments, Inc., which held positions in Avon, Tower Group, and Rocky Mountain, also took advantage of this stock manipulation scheme.

6.     Nedev's trading in connection with these three market manipulations demonstrates that he or others working with him attempted to manipulate the equity price of these three issuers by issuing fraudulent tender offers or press releases.

2

7.     By this Complaint, the Commission charges the defendants with violations of the federal securities laws.  By knowingly or recklessly engaging in the conduct described in this Complaint, defendants violated and, unless restrained and enjoined by the Court, will continue to violate the federal securities laws.

## JURISDICTION AND VENUE

8.     The Commission brings this action pursuant to Sections 20(b) and 20(d)(1) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b) and (d)(1)] and Section 21(d) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§78u(d)], to enjoin such acts, practices, and courses of business; and to obtain disgorgement, prejudgment interest, civil money penalties and such other and further relief as the Court may deem just and appropriate.

9.     This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Sections 21(d) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d) and 78aa].

10.     Venue in this District is proper because certain of the acts, practices, transactions and courses of business constituting the violations alleged herein occurred within the Southern District of New York.  Avon is incorporated in New York and has its principal place of business in New York, New York.  In addition, Avon stock is listed on the New York Stock Exchange, which is located in this district, and defendants' scheme affected the price and volume of trading in Avon stock on the New York Stock Exchange.

11.     In connection with the conduct alleged in this Complaint, defendants made use of a means or instrumentality of interstate commerce, of the mails, or of a facility of any national securities exchange.

## DEFENDANTS

12.     **PTG Capital** identifies itself as a company incorporated in the British Virgin Islands and located in London, United Kingdom.  However, there is no indication that PTG Capital is a legitimate company organized for any other reason than the stock manipulation scheme described here, and PTG Capital (to the extent it actually exists) is operated from Sofia, Bulgaria.  On or about April 21, 2015, PTG Capital obtained an EDGAR login and on or about May 14, 2015, PTG Capital filed a Schedule TO-C with the Commission, falsely announcing a tender offer to acquire the outstanding shares of Avon for $18.75 per share.

13.     **PST Capital** identifies itself as a company incorporated in the British Virgin Islands and located in London, United Kingdom.  However, there is no indication that PST Capital is a legitimate company organized for any other reason than the stock manipulation scheme described here, and PST Capital (to the extent it actually exists) is operated from Sofia, Bulgaria.  On or about December 13, 2012, PST Capital obtained an EDGAR login and on or about December 18, 2012, PST Capital filed a Schedule TO-C with the Commission, falsely announcing a tender offer to acquire the outstanding shares of Rocky Mountain for $13.50 per share.

14.     **Nedev**, age 37, lives in Bulgaria.  Nedev trades equities, options, contracts-for-difference, index futures, commodity futures, and options on futures through a brokerage account in the name of Strategic Capital.  In the account opening form for Strategic Capital, Nedev claimed to reside in Sofia, Bulgaria.

15.     **Strategic Capital** identifies itself as a company incorporated in the British Virgin Islands and located in Sofia, Bulgaria.  Strategic Capital's brokerage account has routinely been accessed via computer from Sofia, Bulgaria.

4

16.    **Strategic Wealth** is a company incorporated in Nevada and located in Henderson, Nevada.  The brokerage account for Strategic Wealth was opened by a Bulgarian citizen and frequently trades in parallel with Nedev's Strategic Capital account.  At various times, Strategic Wealth has traded the securities of Avon, Tower Group, and Rocky Mountain. As of April 30, 2014, 99% of Strategic Wealth's account value was made up of Tower Group and Rocky Mountain stock.  The same IP addresses located in Sofia, Bulgaria have frequently accessed both the Strategic Capital and Strategic Wealth brokerage accounts.

## RELATED PERSONS AND ENTITIES

17.    **Avon** is incorporated in New York with its principal place of business in New York, New York.  Avon is listed on the New York Stock Exchange under the ticker "AVP."

18.    **Tower Group** is incorporated in Bermuda with its principal place of business in Hamilton, Bermuda.  At all times relevant to this complaint, Tower Group was listed on the NASDAQ under the ticker "TWGP."

19.    **Rocky Mountain** is incorporated in Colorado with a principal place of business in Durango, Colorado.  Rocky Mountain is listed on NASDAQ under the ticker symbol "RMCF."

20.    **Euroins Insurance** purportedly is a company located in Sofia, Bulgaria.  On May 13, 2014, a fraudulent press release was issued in the name of Euroins Insurance announcing a purported offer to acquire the outstanding common stock of Tower Group for $3.75 per share.

## TERMS USED IN THIS COMPLAINT

### Contracts for Differences

21.    A contract for difference ("CFD") is an agreement between two parties to exchange the difference in value of an underlying stock between the time the contract is opened and the time at which it is closed.  If the share price increases for the underlying security, the

5

seller pays this difference to the buyer. If, however, the underlying share price declines, the buyer must pay the seller the difference. CFDs generally are not traded in the United States, but they are frequently traded outside the United States and tied to underlying securities traded on U.S. based exchanges.

22.     A CFD typically mirrors the movement and pricing of its underlying stock on a dollar-for-dollar basis, such that any fluctuation in the market price of the underlying security is reflected in the unrealized gain or loss of the CFD position.

23.     Generally, the purchaser of a long CFD position benefits by acquiring the future price movement of the underlying common stock without having to pay for or take formal ownership of the underlying shares.

24.     Generally, the buyer of a CFD is not required to pay for the underlying shares of the security. Instead the CFD buyer only pays the transaction fees charged by the CFD provider plus a potential payment based on any decline in the value of the underlying asset. Thus, a CFD, like a stock option, allows a trader to recognize significant value from an underlying equity's price increase without having to pay for the underlying share.

**EDGAR**

25.     Through the Electronic Data Gathering, Analysis, and Retrieval system, commonly referred to as EDGAR, the Securities and Exchange Commission receives submissions from companies and others who file documents with the Commission.

26.     EDGAR's primary purpose is to increase the efficiency and fairness of the securities market by providing universal public access to time-sensitive corporate information filed with the agency. EDGAR is a primary source of information for the investing public about securities trading in the United States.

6

27.     In order to be able to file documents through EDGAR, a filer must complete a Form ID, which is an electronic application to obtain EDGAR access codes.  As part of the application process, each applicant creates a unique passphrase and must provide: the applicant's name; mailing address; state of incorporation; person to be contacted; and other information. The Form ID must be signed by a duly authorized person, such as an authorized attorney-in-fact for an individual or an officer or director in the case of a company, and notarized.

28.     Once the application is accepted by the Commission, EDGAR sends a unique Central Index Key ("CIK") number in an automated email to the email address on the Form ID application.  This CIK, with a passphrase the filer created when he or she submitted the Form ID, serves as the filer's logon ID for EDGAR.  This EDGAR logon ID enables filers, among other things, to file documents with the Commission electronically, such as tender offers to acquire publicly-traded companies.  When a document is uploaded to EDGAR, it is available to the public.

29.     One type of document filed on EDGAR is a "Schedule TO-C."  A Schedule TO-C is used to report a "written communication relating to an issuer or third party," involving a tender offer.

## FACTS

### A.     The 2015 Avon Market Manipulation

30.     Nedev, through his Strategic Capital account, has traded Avon stock since November 2012 and Avon CFD since August 2013.  By January 6, 2015, Nedev had accumulated 26,000 Avon CFD and by February 12, 2015 he had accumulated 1,700 shares of Avon stock.  Since August 2013, the only CFD position Nedev has traded in this account has been Avon.

7

31.     Between January 6, 2015 and May 13, 2015, the price of Avon stock declined

from $8.61 to $6.67, or over 22%. Accordingly, the value of Nedev's Avon CFD in the Strategic

Capital account also decreased significantly.

32.     As of May 14, 2015, at 11:34 a.m. the price of Avon stock was $6.60 per share.

Nedev's Avon CFD and Avon stock positions were valued at $171,600 and $11,220,

respectively, which represented an unrealized loss of approximately $83,000 and $5,000.

33.     On April 21, 2015, PTG Capital submitted a Form ID to EDGAR as part of its

application for a logon ID. On this Form ID, PTG Capital stated that the company was

incorporated in the British Virgin Islands and that it had a mailing address in London, United

Kingdom. The Form ID contained a signature purportedly notarized by a notary located in

Ventura County, California. The notarization was falsified. The internet protocol ("IP") address

used to submit the Form ID is registered to an internet service provider ("ISP") located in

London, England that enables its users to conceal their identities and locations. PTG Capital was

subsequently granted access to file documents on EDGAR.

34.     On May 14, 2015, at 11:34 a.m., Avon stock was trading at approximately $6.60

per share. At approximately that time, PTG Capital filed a Schedule TO-C falsely stating that

PTG Capital had submitted a proposal to Avon to acquire all of its stock through a cash tender

offer at a price of $18.75 per share. This represented a premium of approximately 181% for

Avon shares. The IP address used to file the Schedule TO-C was registered to an ISP located in

Sofia, Bulgaria. This was the first and only time PTG Capital filed a document through

EDGAR.

35.     Contrary to PTG Capital's Schedule TO-C, Avon did not receive any offer or

other communication from PTG Capital.

36.     PTG Capital's Schedule TO-C had a significant impact on the price of Avon stock and the volume of the shares traded. Within approximately 20 minutes, Avon's stock price increased approximately 21%, from $6.60 to $8.00. The daily volume of trading of Avon shares increased approximately 448%, from 12.7 million on May 13 to 69.57 million on May 14. Specifically, between 11:30 a.m. and 12:30 p.m. on May 14, the volume of trading in Avon shares was more than 31 million.

37.     On May 14, 2015, approximately 25 minutes after the filing of the false Schedule TO-C, between 11:59 a.m. and 12:04 p.m., Nedev sold 12,000 Avon CFD at an average price of $7.01 per CFD contract. Taking advantage of this market manipulation, Nedev received approximately $4,879 more than he would have received absent the artificial increase in Avon's stock price. Nedev executed these trades from Bulgaria. Nedev's unsold Avon CFD and Avon shares also greatly increased in price through this market manipulation.

38.     Defendants' conduct also caused an extreme increase in the volume of trading, such that the New York Stock Exchange halted trading three times in Avon shares in the short time period following defendants' false filing.

**B.     The 2014 Tower Group International Market Manipulation**

39.     Nedev, through his Strategic Capital account, has traded Tower Group stock since October 2013. By May 13, 2014, Nedev's account held 95,558 shares of Tower Group stock. Strategic Wealth traded Tower Group stock and options since October 2013, and by May 13, 2014 it held 290,117 shares of Tower Group stock.

40.     When the market opened on May 13, 2014, Tower Group's stock was trading at $2.24 per share. Nedev's Tower Group stock was valued at approximately $214,000, which represented an unrealized loss of approximately $40,000, and Strategic Wealth's Tower Group

stock was valued at approximately $649,000, which represented an unrealized loss of approximately $223,000.

41.     On May 13, 2014 at 12:26 p.m., a fraudulent press release was issued in the name of a company called Euroins Insurance stating that the company had submitted a letter to Tower Group proposing to acquire the company's outstanding stock for $3.75 per share, which represented a premium of approximately 67% for Tower Group's shares.  The press release listed an address for Euroins Insurance in Sofia, Bulgaria.

42.     Tower Group determined that the offer from Euroins Insurance did not constitute and would not lead to a proposal superior to an existing offer that was made at a lower price per share.  Euroins Insurance did not attempt to actually acquire Tower Group and it appears that the press release was issued for the sole purpose of manipulating the share price of Tower Group stock.

43.     The fraudulent Euroins Insurance press release had a significant impact on the price of Tower Group's stock and the volume of the shares traded.  Tower Group's stock traded at a high of $2.97 per share on May 13, 2014, over 32% higher than the opening price of $2.24 per share that day.  The daily volume of trading in Tower Group's stock increased approximately 1,963%, from 616,503 shares on the previous day to 12.72 million shares.

44.     On May 13, 2014, approximately 25 minutes after the issuance of the fraudulent press release, between 12:51 p.m. and 12:55 p.m., Nedev sold 80,000 shares of Tower Group stock at an average price of approximately $2.53 per share, which was approximately 13% higher than the opening price that day of $2.24 per share.  Taking advantage of this market manipulation, Nedev received approximately $23,368 more than he would have received absent the artificial increase in Tower Group's stock price.  Nedev executed these trades from Bulgaria.

10

At 1:02 p.m., Strategic Wealth sold 10,000 shares of Tower Group stock at a price of $2.48 per share, receiving $2,400 more than it would have received absent the artificial increase in Tower Group's stock price.

## C. The 2012 Rocky Mountain Market Manipulation

45.    Rocky Mountain is an extremely lightly-traded stock.  For example, during 2012, Rocky Mountain's average daily volume was only 14,500 shares.  In comparison, Avon's average daily trading volume for the first four months of 2015 was approximately 13.4 million shares.  Apple, one of the most commonly-trade stocks, has an average daily volume of 51.3 million shares.

46.    In July 2012, Nedev, opened the Strategic Capital account with a U.S.-based brokerage firm.  The first security purchased in this account was Rocky Mountain stock.  Between August 17 and December 18, 2012, Nedev periodically traded Rocky Mountain stock, and as of December 18, the account held 5,034 shares of Rocky Mountain stock worth approximately $53,360.

47.    On or about December 13, 2012, PST Capital submitted a Form ID to EDGAR as part of its application for a logon.  On this Form ID, PST Capital stated that the company was incorporated in the British Virgin Islands and that it had a mailing address in London, United Kingdom.  It also included a contact email address that is registered to an ISP in Bulgaria.  The Form ID contained a signature purportedly notarized by a notary located in Napa County, California.  The IP address used to submit the Form ID is registered to an ISP located in Sofia, Bulgaria.  PST Capital was subsequently granted access to file documents on EDGAR.

48.    On December 18, 2012 at approximately 4:28 p.m., after the market closed, PST Capital uploaded to EDGAR a Schedule TO-C falsely stating that PST Capital had submitted a

proposal to Rocky Mountain to acquire all of its stock through a cash tender offer at a price of $13.50 per share. The proposed offer price of $13.50 per share represented a 27% premium over the closing price of $10.60 per share on December 18, 2012. The IP address used to file the Schedule TO-C was registered to an ISP located in Sofia, Bulgaria. This was the first and only time PST Capital filed a document through EDGAR.

49.     In response to the filing, in after-hours trading on December 18, 2012, Rocky Mountain's share price jumped 23% to approximately $13.01 per share.

50.     Prior to the market opening of the market on December 19, 2012, however, Rocky Mountain disclosed that there were numerous problems with this proposed tender offer that cast doubt on its credibility.

51.     After the market opened on December 19, 2012, in response to the false filing the price of Rocky Mountain stock rose approximately 4.6% above the previous day's close of $10.60 per share to a high of $11.09 per share. On December 19, 2012, 119,925 shares were traded for a one-day volume increase of approximately 1,780%.

52.     Contrary to PST Capital's Schedule TO-C, Rocky Mountain did not receive a legitimate tender offer and the Schedule TO-C was entirely false.

53.     Nedev did not sell his position in Rocky Mountain after the manipulation, likely because the false document did not cause a large enough price increase during regular market hours, particularly in light of the statement made by Rocky Mountain prior to the opening of the market on December 19, 2012.

**D.     These Three Market Manipulations Share Common Facts**

54.     The facts and circumstances surrounding these three market manipulations demonstrate that Nedev and/or others working with him engaged in a coordinated attempt to

12

manipulate the equity price of these three issuers by issuing fraudulent tender offers or press releases.

55.     Nedev traded equity positions in all three issuers.  It is highly unlikely that Nedev's trading was mere coincidence given that the manipulations occurred over four years, involved very different issuers, and occurred in at least one extremely lightly-traded stock.

56.     The wording used in the two fake tender offers and fake press release was identical in the following parts.

  a.  The specific phrase, "[company] has substantial experience in managing acquisitions and is committed to working quickly to complete due diligence and execute a definitive agreement," was used in all three documents.

  b.  The specific phrase, "The Proposed Offer does not create any binding obligation, and no such binding obligation will arise unless and until a mutually satisfactory definitive agreement has been executed and delivered by the parties," was used in all three documents.

57.     Each of the market manipulations involved some connection to Bulgaria.  The IP addresses used to file both Schedule TO-Cs show that these documents were uploaded from Bulgaria.  And Euroins is a company purportedly located in Sofia, Bulgaria.  These facts demonstrate that Nedev or others working with him are coordinating this market manipulation scheme from Bulgaria.

## HARM TO THE MARKETS

58.     Defendants' conduct caused direct substantial harm to the U.S. markets and investors.  The false Schedule TO-C related to Avon caused millions of Avon shares to be traded at artificially inflated prices.  Investors who purchased Avon shares after the false filing, either

because of the filing or for other reasons, paid artificially inflated prices for those shares. The fraudulent press release related to Tower Group caused millions of Tower Group shares to be traded at artificially inflated prices. Investors who purchased Tower Group shares after the fraudulent press release was issued, either because of the press release or for other reasons, paid artificially inflated prices for those shares.

59.     Defendants' conduct also caused tremendous intangible harm to the U.S. markets and investors. The filing of false documents on the Security and Exchange Commission's EDGAR system undermines investors' confidence.

## CONCLUSION

60.     Using fraudulently obtained access to EDGAR and a fraudulent press release, defendants manipulated the stock prices of Avon, Tower Group, and Rocky Mountain for the benefit of defendants Nedev, Strategic Capital, Strategic Wealth, and others unknown.

61.     Defendants acted in concert to knowingly or recklessly artificially inflate the stock price of Avon, Tower Group, and Rocky Mountain.

## CLAIMS FOR RELIEF

### Violations of Section 17(a)(1) and (3) of the Securities Act
### *(Against Nedev, Strategic Capital, and Strategic Wealth)*

62.     The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1-61 inclusive, as if they were fully set forth herein.

63.     In May 2014, Nedev, Strategic Capital, and Strategic Wealth have, directly or indirectly, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, in the offer or sale of securities:  (a) employed devices, schemes, or artifices to defraud; and/or (b) engaged in transactions, practices or courses of

business which operated or would operate as a fraud or deceit upon the purchasers of securities offered or sold by the defendants.

64.      By reason of the foregoing, Nedev, Strategic Capital, and Strategic Wealth violated, and unless enjoined will continue to violate, Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1) and (3)].

**Violations of Section 17(a)(2) of the Securities Act**
***(Against Nedev and Strategic Capital)***

65.      The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1-64 inclusive, as if they were fully set forth herein.

66.      In May 2014, Nedev and Strategic Capital have, directly or indirectly, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, in the offer or sale of securities, obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

67.      By reason of the foregoing, Nedev and Strategic Capital violated, and unless enjoined will continue to violate, Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) Thereunder**
***(Against All Defendants)***

68.      The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1-67 inclusive, as if they were fully set forth herein.

69.      From at least December 2012 to May 2015, the defendants have, directly or indirectly, by use of the means or instruments of interstate commerce or of the mails, or the facility of national securities exchanges, in connection with the purchase or sale of securities, knowingly or recklessly:  (a) employed devices, schemes, or artifices to defraud; and/or (b)

engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person.

70.     By reason of the foregoing, the defendants violated and, unless enjoined, will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(a) and (c) [17 C.F.R.§ 240.10b-5(a) and (c)], thereunder.

## Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) Thereunder
### (Against PTG Capital, PST Capital, Nedev, and Strategic Capital)

71.     The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1-70 inclusive, as if they were fully set forth herein.

72.     From at least December 2012 to May 2015,  PTG Capital, PST Capital, Nedev, and Strategic Capital have, directly or indirectly, by use of the means or instruments of interstate commerce or of the mails, or the facility of national securities exchanges, in connection with the purchase or sale of securities, knowingly or recklessly made untrue statements of material fact or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

73.     By reason of the foregoing, PTG Capital, PST Capital, Nedev, and Strategic Capital violated and, unless enjoined, will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(b) [17 C.F.R.§ 240.10b-5(b)], thereunder.

## Violations of Section 14(e) of the Exchange Act and Rule 14e-8(b) and (c) Thereunder
### (Against All Defendants)

74.     The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1-73 inclusive, as if they were fully set forth herein.

75.     In December 2012 and in April and May of 2015, the defendants engaged in fraudulent, deceptive, or manipulative acts or practices, in connection with a tender offer or

request or invitation for tenders, and a solicitation of security holders in favor of the offer, request or invitation.

76.     In April and May 2015, the defendants intended, directly or indirectly, the purported Avon tender offer announcement to manipulate the market price of the stock of the bidder or subject company, or the defendants did not have the reasonable belief that PTG Capital had the means to purchase the securities of Avon to complete the offer.

77.     In December 2012, defendants intended, directly or indirectly, the purported Rocky Mountain tender offer announcement to manipulate the market price of the stock of the bidder or subject company, or did not have the reasonable belief that PST Capital had the means to purchase securities to complete the offer.

78.     By reason of the foregoing, defendants violated, unless enjoined, will continue to violate, Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] and Rule 14e-8(b) or (c) thereunder [17 C.F.R. § 240.14e-8(b) or (c)].

### Violations of Section 14(e) of the Exchange Act and Rule 14e-8(a) Thereunder
### _(Against PST Capital, PTG Capital, Nedev, and Strategic Capital)_

79.     The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1-78 inclusive, as if they were fully set forth herein.

80.     In December 2012 and in April and May of 2015, PST Capital, PTG Capital, Nedev, and Strategic Capital made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or engaged in fraudulent, deceptive, or manipulative acts or practices, in connection with a tender offer or request or invitation for tenders, and a solicitation of security holders in favor of the offer, request or invitation.

81.     In April and May 2015, PTG Capital, Nedev, and Strategic Capital made materially false and/or misleading statements in the Form ID and Schedule TO-C they filed with the Commission in connection with a purported tender offer to acquire the outstanding shares of Avon. PTG Capital and Nedev knew, or were reckless in not knowing, that the statements they made were false and/or misleading. At the time of the announcement of the tender offer, PTG Capital and Nedev did not reasonably believe they had the intention to commence the offer within a reasonable time and complete the offer.

82.     In December 2012, PST Capital, Nedev, and Strategic Capital made materially false and/or misleading statements in the Form ID and Schedule TO-Cs they filed with the Commission in connection with a purported tender offer to acquire the outstanding shares of Rocky Mountain. PST Capital, Nedev, and Strategic Capital knew, or were reckless in not knowing, that the statements they made were false and/or misleading. At the time of the announcement of the tender offer, PST Capital, Nedev, and Strategic Capital did not reasonably believe they had the intention to commence the offer within a reasonable time and complete the offer.

83.     By reason of the foregoing, PST Capital, PTG Capital, Nedev, and Strategic Capital violated, unless enjoined, will continue to violate, Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] and Rule 14e-8(a) thereunder [17 C.F.R. § 240.14e-8(a)].

## Violations of Section 20(a) of the Exchange Act
### (Against Nedev)

84.     The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1-83 inclusive, as if they were fully set forth herein.

85.     As alleged above, Strategic Capital violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Sections 10(b) and 14(e) of the Exchange Act [15 U.S.C. §§ 78j(b), 78n(e)], and Exchange Act Rules 10b-5 and 14e-8 [17 C.F.R.§ § 240.10b-5 and 240.14e-8].

86.     Through his position and by his conduct, Nedev controlled Strategic Capital.

87.     Through his position and by his conduct, Nedev possessed the power or ability to control the specific transactions and activities upon which Strategic Capital's violations of Section 17(a) of the Securities Act, Sections 10(b) and 14(e) of the Exchange Act, and Exchange Act Rules 10b-5 and 14e-8 are based, whether or not that power was exercised.

88.     By virtue of the foregoing, pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], Nedev is jointly and severally liable with, and to the same extent as, Strategic Capital for its violations of Section 17(a) of the Securities Act, Sections 10(b) and 14(e) of the Exchange Act, and Exchange Act Rules 10b-5 and 14e-8.

## Violations of Section 20(b) of the Exchange Act
### *(Against Nedev)*

89.     The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1-88 inclusive, as if they were fully set forth herein.

90.     Between December 2012 and May 2015, defendant Nedev, either directly or indirectly, violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Sections 10(b) and 14(e) of the Exchange Act [15 U.S.C. §§ 78j(b), 78n(e)], and Exchange Act Rules 10b-5 and 14e-8 [17 C.F.R.§ § 240.10b-5 and 240.14e-8] through or by means of defendants PTG Capital, PST Capital, Strategic Capital, and/or Strategic Wealth.

91.     By reason of the foregoing, defendant Nedev violated, and unless enjoined will continue to violate, Section 20(b) of the Exchange Act [15 U.S.C. § 78t(b)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter an emergency, temporary, and preliminary order freezing the assets of Nedev's account in the name of Strategic Capital and the assets in the account of Strategic Wealth, prohibiting the destruction of documents, and ordering expedited discovery and alternative means of service.

Further, the Commission respectfully requests that the Court enter a final judgment:

### I.

Permanently restraining and enjoining defendants from, directly or indirectly, violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] and from engaging in conduct in violation of Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] and Rule 14e-8 thereunder [17 C.F.R. § 240.14-e8];

### II.

Ordering each defendant to disgorge all ill-gotten gains or unjust enrichment derived from the activities set forth in this Complaint, jointly and severally, together with prejudgment interest thereon;

### III.

Ordering each defendant to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)];

IV.

Grant such other and further relief as this Court may deem just, equitable, or necessary in connection with the enforcement of the federal securities laws and for the protection of investors.

Respectfully submitted,

Date:   June 4, 2015

Assunta Vivolo
David L. Axelrod*
Kelly L. Gibson*
John V. Donnelly, III*
David W. Snyder*

U.S. Securities and Exchange Commission
Philadelphia Regional Office
1617 JFK Boulevard, Suite 520
Philadelphia, PA  19103
(215) 597-1047 (Vivolo)
VivoloA@sec.gov

*Not admitted in the S.D.N.Y.

**Of Counsel**
Daniel M. Hawke*
Robert A. Cohen
Joseph G. Sansone